**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT** | **CIVIL ACTION NO.** |
| **OPPORTUNITY COMMISSION,** | **10-3322** |
| **Plaintiff** | |
| | **SECTION B** |
| **v.** | **JUDGE LEMELLE** |
| | |
| **RESOURCES FOR HUMAN DEVELOPMENT, INC.** | **MAG. 2 (WILKINSON)** |
| **D/B/A FAMILY HOUSE OF LOUISIANA** | |
| **Defendant** | |

---

**EEOC'S OPPOSITION TO DEFENDANT'S**
**SECOND MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, the United States Equal Employment Opportunity Commission (EEOC), submits this Memorandum in Opposition to Defendant's Second Motion for Summary Judgment.

## I.   INTRODUCTION

Defendant's Motion should be denied.   First, although Defendant argues that Ms. Harrison was not qualified to perform the essential functions of her position, Defendant has not even mentioned, much less provided evidence of, what the essential functions of Ms. Harrison's position were, therefore falling woefully short of meeting its burden to show there is no genuine issue of fact.   Ms. Harrison performed the essential functions of her job for almost eight years, until Defendant fired her, without any written notice of performance deficiencies that might warrant termination.   Second, Defendant's judicial estoppel argument fails as a matter of law. The EEOC cannot be judicially estopped from asserting this ADA claim; the EEOC's pursuit of victim-specific relief is not derivative of any cause of action of Ms. Harrison, who is not a party to this lawsuit.   The EEOC filed this lawsuit.   In prosecuting this case, the EEOC has an independent cause of action and independent interests – chiefly, the public interest in deterring and eliminating employment discrimination.   Third, even if estoppel could bar an EEOC action, Defendant has not met its burden of showing that Ms. Harrison's actions meet the Supreme Court's standard for such extraordinary relief.   The gravamen of Defendant's motion is that Ms. Harrison's Social Security Disability Income ("SSDI") application is "irreconcilable" with her ADA charge, thereby warranting judicial estoppel.[1]   As discussed fully below, Ms. Harrison's statements to the Social Security Administration ("SSA") and the EEOC were not inconsistent.

---

[1] Defendant contends in its motion that there is a lack of genuine dispute with respect to whether Ms. Harrison was a qualified individual with a disability, based solely on her SSDI application.  The EEOC's opposition illustrates that Defendant is incorrect about the lack of a genuine dispute of material fact, as relates to Ms. Harrison's SSDI application.  The EEOC has not here presented *all* evidence that exists with respect to Ms. Harrison's ability to perform the essential functions of her job, which is beyond the scope of the motion that Defendant has filed, particularly where Defendant has not even provided evidence regarding the essential functions of Ms. Harrison's position.  Additionally, discovery is ongoing on these matters.

## II.      FACTUAL BACKGROUND

Defendant hired Charging Party Lisa Harrison in 1999 as a Prevention/Intervention specialist. Her job required her to oversee a day care program and care for children of mothers at Defendant's facility. Ms. Harrison worked for Defendant almost eight years, until Defendant fired her on September 6, 2007. Defendant contends it fired Ms. Harrison because, as a result of her mobility impairments, Ms. Harrison allegedly posed a direct threat to herself or others.[2] (*See* Am. Answer, R. Doc. 12, ¶ 22). In her Charge of Discrimination, Ms. Harrison alleged:

> I was discharged because of my weight. I was called into Michelle Vick's office and told that I was terminated. She said that Jefferson Parish (who funds the program) told her to terminate me due to my limited mobility. She stated that I would have difficulty administering CPR but I have a CPR card and have had one for the 8 years I worked for Family House. . . .

(R. Doc. 19-3.) As alleged in Plaintiff's Complaint, at all times relevant, Ms. Harrison was morbidly obese. She was 5'2" tall and weighed over 500 pounds during her employment. Ms. Harrison was qualified and able to do her job, and had done so for many years. In her charge, Ms. Harrison stated: "at no time during my employment has my weight caused me difficulty nor stopped me from performing my job." (R. Doc. 19-3.) The only performance evaluation Defendant has produced, from March 24, 2006, shows that Ms. Harrison's supervisor rated Ms. Harrison as "excellent" in seven out of 12 areas, including "Quality of work." (R. Doc. 26-5.)

Ms. Harrison was devastated by her termination. Her doctor wrote, after examining her eight days post-termination: "[L]isa has been working at the family house for 8 y[ea]rs . . ." Ms. Harrison reported to her treating physician on September 14, 2007, that, "she was fired due to her weight, feels worthless and feels like life is not wor[th] living anymore. . ." (Pl.'s Ex A at 1.)

---

[2] Defendant admits that it is unaware of any documents which informed Ms. Harrison, during her employment, that she posed a direct threat to the health or safety of herself or others in the workplace, and further admits it never gave her a written warning that she might face termination in light of performance concerns. (Pl.'s Ex. B, Def.'s Resp. Req. for Admis. 26, 88.)

Her doctor described her as "clearly depressed," referred her to a specialist, and prescribed Cymbalta, to be taken along with the Zoloft she was already prescribed.  Ms. Harrison's family members said she was "crushed" and "devastated" by being fired and noted that "Lisa loved her job.  She loved the children." (Pl.'s Ex C, Juneau Dep. 54:9-10; 45:5-7; Pl.'s Ex D, Duong Dep. 76:24 – 77:3; 50:10-15.)

In September 2007, Ms. Harrison applied for Social Security Disability Income (SSDI) benefits, listing the date Defendant fired her as the date she became unable to work.  In her application she listed the following conditions as limiting her ability to work: "Obesity, back and leg problems, lung problems, hbp, asthma, depression, diabetes." (*Id.* at 3.)  She also stated: "I have been extremely depressed and life feels like it's not worth the effort anymore." (*Id.* at 13.)  On November 1, 2009, Ms. Harrison died.  The EEOC filed this suit on behalf of her estate, alleging that Defendant violated the ADA by terminating Ms. Harrison because of her disability.

## III.   LEGAL STANDARDS

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir. 2007).  The Court must construe all facts and inferences in the light most favorable to the nonmovant and cannot weigh evidence or evaluate credibility. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

### B.   Standard for Affirmative Defense of Judicial Estoppel

Judicial estoppel is an equitable doctrine that precludes a party from successfully asserting one position in a judicial proceeding, and subsequently asserting an inconsistent position in a separate proceeding. *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988). "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation of one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Ryan Operations G.P. v. Santiam-Midwest Lumbar Co.*, 81 F.3d 355, 358 (3d Cir. 1996).   Thus, courts distinguish between a party's good and bad faith conduct in invoking the doctrine. *See, e.g., Tenneco Chems v. William T. Burnett & Co.*, 691 F.2d 658, 665 (4th Cir. 1982).   In *In Re Ellington*, 151 B.R. 90 (W.D. Tex., Jan. 29, 1993), the court opined that an essential justification of judicial estoppel is to prevent the use of intentional self-contradiction to obtain unfair advantage, but noted that "[c]ourts have traditionally applied the doctrine with caution," and only where "clearly inconsistent positions are taken." *Id.* at 97.

## IV.   LAW AND ARGUMENT

### A.   Defendant has failed to meet its Burden as Movant of Showing that Ms. Harrison was Not a Qualified Individual.

Defendant asks this Court to dismiss the EEOC's case, based purely on its own *assumptions* that Ms. Harrison could not perform the essential functions of her position because she was obese, without even naming the essential functions of Ms. Harrison's position. Defendant lists statements made by Ms. Harrison on her SSDI application, including statements about her ability to do household chores, such as cooking and vacuuming, extensively discusses the conclusions of a physician consulted by the Social Security Administration ("SSA"), who examined her only once, after she was terminated, and then conclusorily asserts that "by her own admissions, Lisa Harrison could not perform the essential functions of the job of watching and educating preschool (ages 3-5) children." (R. Doc. 34-3 at 8.)   Critically, the SSDI context

assumes that no reasonable accommodation of any alleged direct threat exists.   Defendant reaches this conclusion despite never providing any evidence about what the essential functions of Ms. Harrison's position were, and not even attempting to illustrate how Ms. Harrison's comments about her difficulty doing household chores illustrates she could not perform these functions.   The ADA requires an individualized inquiry about the abilities of employees, despite any actual or perceived impairments, specifically to avoid these type of stereotypical assumptions.[3]  *See, e.g., School Board of Nassau County v. Arline*, 480 U.S. 273, 283-84 (1987) ("Society's accumulated myths and fears about disability . . . are as handicapping as are the physical limitations that flow from actual impairment."); *Stone v. City of Mount Vernon*, 118 F.3d 92 (2d Cir. 1997) (reversing dismissal of paraplegic firefighter's ADA claims, holding that genuine issues of fact precluded summary judgment regarding whether fire suppression was essential function, and whether employer could reasonably accommodate firefighter's disability).

The Plaintiff bears the burden at trial of showing that an employee is a qualified individual, including showing that the employee can perform the essential functions of her position, with or without reasonable accommodation.   However, the *employer* "has the burden of showing a particular job function is an essential function of the job."   *Rehrs v. Iams Co.,* 486 F.3d 353, 356 (8th Cir. 2007); *Dropinski v. Douglas County,* 298 F.3d 704, 707 (8th Cir. 2002) (stating that when an employer disputes that a plaintiff can perform the essential functions of a job, the employer must present evidence establishing those functions).[4]  Ms. Harrison did her job,

---

[3] Defendant's assumptions embody the stereotypes the ADA is meant to protect against.  Defendant states, "In that process, she stressed the debilitating effects of her obesity on her health and represented that she was *totally disabled.*  As such Ms. Harrison cannot be considered a qualified individual…" (R. Doc. 34-3 at 4.) Being disabled and qualified are not antithetical; both may actually be necessary elements of an ADA claim.  Ironically, in its first motion, Defendant argued Ms. Harrison could not be disabled by her obesity, and Defendant now avers she was so disabled she could not be a qualified individual.  Defendant's inconsistent statements to this Court are irreconcilable.

[4] *See also Ward v. Mass. Health Research Inst., Inc.,* 209 F.3d 29, 35 (1st Cir. 2000); *Supinski v. United Parcel Service, Inc.*, 413 Fed. App'x 536 (3d Cir. 2011); 29 C.F.R. pt. 1630, app. § 1630.2(n) (while "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production

for almost eight years.  Defendant admits that it did not, prior to Ms. Harrison's termination, give her a written warning that she might face termination in light of performance concerns. (Pl.'s Ex B, Def.'s Resp. Req. Admis. 88.)  Ms. Harrison had established a track record of performing the essential functions of her job.  Defendant has not met its burden of showing no genuine dispute of fact with respect to what the essential functions are, or that there is no genuine dispute of fact as to whether she was able to perform them. *Washburn,* 504 F.3d at 508.

Beyond Defendant's failure to meet its burden of proof, its assumptions about Ms. Harrison's abilities do not withstand scrutiny under Fifth Circuit law.  In *Giles v. General Electric Company*, 245 F.3d 474, 486 (5th Cir. 2001), the court recognized the importance of evaluating whether any limitations listed in a disability application are relevant to the position at issue.  The court distinguished *Giles* from *Reed v. Petroleum Helicopters, Inc.,* 218 F.3d 477 (5th Cir. 2000), where the Fifth Circuit held that although the plaintiff's general statements of total disability may not have been incompatible with her being a qualified individual, her specific assertions on her SSDI application would render her unable to obtain a government license necessary for the performance of her old position as a helicopter pilot. *Id.* at 480, 485.

Defendant relies on statements Ms. Harrison made in her disability application, despite knowing that these are not related to her ability to perform her position.  For example, Defendant references Ms. Harrison's statements about using a scooter.  Assuming that using a scooter is relevant to Ms. Harrison's abilities to perform essential functions, Defendant has not made, and cannot make, any argument that Ms. Harrison's use of a scooter during her personal time to grocery shop and travel distances affected her at work.  Defendant has already admitted that Ms.

---

standards," the employer "will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper").

Harrison never used an assistive device during her almost eight years of employment.[5]

Much of the "evidence" cited by Defendant has nothing to do with Ms. Harrison's position. Defendant has offered no evidence that the following functions were essential functions of Ms. Harrison's position, despite spending an entire page quoting statements about them: bathing her dog alone, not having pain while sleeping, mopping a specific way, vacuuming without resting, going out when home, or not using a scooter during her off hours.[6] Although Defendant quotes comments indicating Ms. Harrison could not walk "far" or stand "for awhile," Defendant offers no evidence about how much time Ms. Harrison needed to stand, or how far she needed to walk, to perform the essential functions of her job. Even had Defendant offered such evidence, these bare comments are too vague to establish that Ms. Harrison could not perform the essential functions of her position.[7] *See Turner v. Hershey Chocolate USA*, 440 F.3d 604, 609 (3d Cir. 2006) (recognizing that similar responses in SSDI application were not inconsistent with being qualified because they did not "address the severity of the pain experienced and whether such pain would make her incapable of performing the essential functions of the [] position.").

On November 3, 2007, *after* Ms. Harrison's termination, a doctor examined Ms. Harrison, for an undetermined amount of time, for the SSA. He admits that the exam was not "adequate." (Ex E, SSA 0087) ("her size precludes an adequate physical exam/assessment.") He also makes statements that indicate issues of fact within the SSA records themselves, noting, for example, that Ms. Harrison has a "[n]ormal gait, able to rise from a sitting position without

---

[5] (Pl.'s Ex B, Def.'s Resp. Req. Admis. 62) ("62. At no time during her employment with Defendant did Lisa Harrison use an assistive device to walk, or to otherwise get around, at Defendant's work place. Answer: Admitted."). Further, as discussed below, a scooter may serve as an appropriate reasonable accommodation.

[6] As noted in the Statement of Contested Facts, Defendant inaccurately states Ms. Harrison was unable to do laundry, when Ms. Harrison states in her SSDI application that she was "able" to do laundry. (R. Doc. 34-6 at 8.)

[7] Due to space constraints, the EEOC refers the Court to its Statement of Contested Facts, which responds in detail to all statements from Ms. Harrison's SSDI application that Defendant relies upon.

assistance," and "able to bend to 90 degrees." (Ex E, SSA 0086-87.)  The doctor nevertheless concluded that Ms. Harrison is "unable to walk and/or stand for a full workday." (Ex E, SSA 0087).  Further, his analysis relates to her ability to walk or stand for a full day, making no allowance for accommodations, if needed.  Defendant submits no evidence that walking or standing for a full workday was part of Ms. Harrison's job.  To the contrary, describing her own job, Ms. Harrison listed walking and standing as something she did for one hour, "off and on." (Ex E, SSA 51.)  The statements of an SSA doctor also cannot be attributed to Ms. Harrison, and are irrelevant to Defendant's assertion of judicial estoppel.[8]

The SSA also requested a physical residual function capacity assessment of unknown duration, which, like the doctor consult, took place *after* Ms. Harrison's termination.  Again, Defendant makes no connection between this assessment and the essential functions of Ms. Harrison's position.  Defendant cites several statements from the assessment, but provides no evidence of their relevance.  There is no evidence, for example, that Ms. Harrison's position required her to get on exam tables, stand on her tiptoes, tandem walk (where the toes of the back foot touch the heel of the front foot) without difficulty, or squat without difficulty.[9]

### B.      The EEOC Cannot be Judicially Estopped Based on Ms. Harrison's Actions.

Defendant cannot show that the Supreme Court's standards for judicial estoppel are met. Judicial estoppel is an equitable doctrine invoked at the court's discretion to prevent a *party* from

---

[8] Some of the doctor's conclusions are also contradicted by interview notes in the SSDI file.  In a face-to-face interview with someone from SSA's Field Office on September 20, 2007, the interviewer noted, for example, that Ms. Harrison did not present any problems with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing. (R. Doc. 34-6 at 2.)

[9] Further, like the "inadequate" doctor's exam, the evaluation summarizing the assessment is inaccurate.  It says "Could not do straight leg raise," when the exam notes indicate this test was never performed because Ms. Harrison could not get on the exam table. (Pl.'s Ex E, SSA 0087.)  Additionally, as discussed below, Ms. Harrison's depressed condition when she applied for SSDI benefits was not the same as her condition before Defendant fired her, consequently these statements do not provide evidence about her abilities at the relevant legal time period, when the adverse action happened.

deliberately changing positions that the *party* previously asserted. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  The Supreme Court outlined three factors courts may consider. *Id.* at 750-51.  First, a *party*'s position must be "clearly inconsistent with its earlier position." *Id.*  Second, the *party* must have successfully persuaded a court to accept the party's earlier position. *Id.*  Third, the *party* seeking to assert an inconsistent position must "derive an unfair advantage or impose an unfair detriment on an opposing party if not estopped." *Id.*

Defendant cannot establish any of these three factors.  The EEOC was not a party to the Social Security proceedings of Ms. Harrison, and therefore the EEOC could not have previously taken, and prevailed upon, a position inconsistent with its allegations here.  Defendant merely identifies statements by Ms. Harrison to the Social Security Administration.  The EEOC had no control over Ms. Harrison's decision to file for social security disability benefits, did not exercise or influence her decisions, and did not participate in those proceedings.  Most importantly, since the EEOC was not involved in those proceedings, it cannot be deemed to have held an "earlier position" that is even plausibly inconsistent with its positions in the present case.

Defendant essentially argues that the EEOC serves as a proxy for the Charging Party, an argument rejected by the Supreme Court.  The Court has made clear that when the EEOC files suit, it "is not merely a proxy for the victims of discrimination." *General Telephone Co. of the Northwest v. EEOC*, 446 U.S. 318, 326 (1980); *see also EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002) (arbitration agreement not binding on EEOC).[10]  The EEOC, therefore, is not estopped by the actions of individual charging parties.  In *EEOC v. Autozone, Inc.,* 07-1154,

---

[10] This Court recently recognized that "the EEOC represents the public interest." *EEOC v. Boh Brothers Construction Co.,* 2011 WL 5182525, *2 (E.D. La. Oct. 31, 2011) (Lemelle, J.) (quoting *U.S. v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 870 (5th Cir. 1975) ("[t]he EEOC does not stand in a lawyer-client posture . . . [r]ather, the Commission must endeavor to eliminate discrimination in a manner consistent with the public interest.")).

9

2009 WL 464574, *5 (C.D. Ill. Feb. 23, 2009), the court denied defendant leave to amend its answer to assert estoppel, holding such a defense would be "futile."

> In other words, the EEOC's interest in pursuing perpetrators of discrimination is much broader than simply obtaining relief for the victim of that discrimination . . .

> Also crucial is the underlying policy of the doctrine of judicial estoppel: namely, the prevention of manipulation of the courts by litigants who seek to prevail twice on opposite theories. The EEOC was not (and could not have been) a litigant in administrative proceedings before the SSA. It had no control over or input into the application process. . . .

> The EEOC is not a proxy for [charging party] Alan Shepherd. It's [sic] interest in pursuing relief on Shepherd's behalf is a public interest in eliminating discrimination, and that interest is not as narrow as is Shepherd's interest. The EEOC is therefore not estopped by Shepherd's statements and conduct, and I conclude that the affirmative defense of judicial estoppel is futile as a matter of law.

*Id.* *4-5.   In analogous cases, courts have held that the EEOC cannot be estopped based on statements made by charging parties in bankruptcy petitions.  In *EEOC v. Tobacco Superstores, Inc.*, 05-218, 2008 WL 2328330 (E.D. Ark. Jun. 4, 2008), the court rejected the defendant's argument that judicial estoppel could be applied to the EEOC's claims based on statements of class members in bankruptcy filings.  The court reasoned, consistent with *Autozone*, that:

> Since the class members did not file this action, they are not a party to this action, and they have no control over the EEOC's decision to bring this action, I will not expand the doctrine of judicial estoppel to hold that the class members abused the judicial process when they are not in control over the case.

*Id.* at *8.[11]   These cases identify the EEOC's broader remedial mandate to prosecute and eradicate employment discrimination as an overriding basis for permitting the pursuit of victim-specific relief, even when the conduct of non-parties might preclude recovery in a private suit.

---

[11] *See also EEOC v. Digital Connections, Inc.*, 2006 WL 2792219 (M.D. Tenn. 2006) (declining to apply judicial estoppel to EEOC based on class member's failure to disclose claim in bankruptcy); *EEOC v. Apria Healthcare Group, Inc.*, 222 F.R.D. 608, 613 (E.D. Mo. 2004) (same); *EEOC v. Frank's Nursery & Crafts*, 177 F.3d 448, 464 (6th Cir. 1999) (declining to estop EEOC where victim of discrimination had agreed to resolve dispute by arbitration).

Those courts which have held to the contrary either did not squarely address this issue, or misapplied binding Supreme Court law, and should be overturned on appeal.  For example, in *EEOC v. Greater Baltimore Medical Center, Inc.*, 769 F. Supp. 2d 843, 851 (D. Md. 2011), the court incorrectly relied on Fourth Circuit precedent to hold that "*EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373 (4th Cir. 2000) compels the conclusion that the EEOC *can* be barred from bringing an ADA suit under *Cleveland* if the EEOC does not provide a sufficient explanation for an apparent contradiction between a claimant's SSDI application and the claimant's later contentions that he is able to work."  However, the court misread *Stowe-Pharr Mill, Inc.*, in which there is no indication the EEOC even raised the argument that judicial estoppel did not apply to it.  Even had the EEOC raised the argument, the Fourth Circuit need not have considered it, since it held that the district court's grant of summary judgment was factually unwarranted.[12] *Stowe-Pharr Mills*, 216 F.3d at 375 ("[W]e conclude that the EEOC has made a sufficient explanation and proffer on [charging party's] behalf to avoid summary judgment on the 'qualified individual' element of the ADA claim.").  As held by the majority of courts, application of judicial estoppel here would be inconsistent with the EEOC's public interest in enforcement of the ADA. "When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." *General Telephone*, 446 U.S. at 326 (internal citations and quotations omitted).

### C.   Ms. Harrison's Seeking of Benefits was not Inconsistent with her ADA Charge, Precluding the Application of Judicial Estoppel under *Cleveland*.

Defendant has not shown that any party to this action successfully took an inconsistent position with an earlier position before a court. *New Hampshire*, 532 U.S. at 750-51.  Even if

---

[12] The Maryland case is on appeal, as is the decision in *EEOC v. CRST Van Expedited, Inc.*, 614 F. Supp. 2d 968 (N.D. Iowa 2009).  In the only other contrary decision counsel is aware of, *EEOC v. Dave's Detailing, Inc.*, 2008 WL 1968315, *3 (W.D. Ky. May 2, 2008), the court's reasoning reflected its opinion, contrary to Supreme

judicial estoppel could apply to the EEOC's claims, which it cannot, Defendant cannot establish the third element of judicial estoppel, because Ms. Harrison's statements to the SSA and the EEOC were not inconsistent. *McClaren v. Morrison Management Specialists, Inc.*, 420 F.3d 457, 464 (5th Cir. 2005) ("[W]e must first address whether there is a genuine conflict between [plaintiff's] statements to the SSA and his claim under the TCHRA.").

The evidence supports the inference that Defendant's firing Ms. Harrison caused her to become unable to work. Her application for benefits after she was terminated is therefore not inconsistent with her statements to the EEOC that she was able to work before Defendant fired her. First, Ms. Harrison's statements to the SSA, and to her treating physician on September 14, 2007, illustrate her severe depression *as a result of her termination*. Given the symptoms of depression and the side-effects of Ms. Harrison's depression medication (including fatigue, trouble concentrating, and body aches), a reasonable jury could conclude that Ms. Harrison's SSDI statements were not inconsistent with her good-faith belief that she could, before the termination, perform the essential functions of her job, with or without a reasonable accommodation.[13] Indeed, all evidence shows that Ms. Harrison did perform the essential functions of her position up to the day of her discharge. Second, a jury could find that Ms. Harrison viewed herself as unable to work because of the attitudes of others; her employer of eight years terminated her because of her weight.[14] Morbid obesity is a visible condition and employment discrimination on the basis of it is well-documented. Ms. Harrison's statements are

---

Court precedent, that the EEOC acts as a mere proxy for employees, and is therefore not persuasive.

[13] The issue in this case is whether Ms. Harrison was a qualified individual the day she was fired, not the day she applied for disability benefits. "The determination of whether an individual with a disability is qualified is to be made *at the time of the employment decision*." 29 CFR Pt. 1630, App., Section 1630.2(m) (emphasis added).

[14] 29 C.F.R. § 1630.2(l)(2) (prior version) ("Is regarded as having such an impairment means: . . . (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the *attitudes of others* toward such impairment.") (emphasis added).

also not inconsistent because a jury could find that any alleged direct threat could have been eliminated by reasonable accommodation, which the SSA does not take into consideration.

Finally, Defendant cannot show that the EEOC will "derive an unfair advantage or impose an unfair detriment on an opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51. Many of the cases Defendant cites reflect the courts' efforts to deal with plaintiffs acting in bad faith. *See, e.g., Detz v. Greiner Industries, Inc.*, 346 F.3d 109, 121 (3d Cir. 2003) ( "Detz appears to have manipulated the facts and perhaps the system, to obtain SSDI benefits"); *Lagatta v. Pennsylvania Cyber Charter School*, 08-1268, 2011 WL 3957294, *7 (W.D. Pa. Sept. 7, 2011) (finding that inconsistent factual statements "were made in bad faith").[15] There is no evidence here that the EEOC or Ms. Harrison acted in bad faith.[16]

In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the Supreme Court unequivocally held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA." *Id.* at 797-98. The Court recognized that the SSA's analysis of disability differs from that under the ADA, and further that "[a]n SSA

---

[15] *Lagatta*, relied upon extensively by Defendant, is an unpublished, non-binding case which carries no precedential value for this Court. Additionally, it is clearly distinguishable. The court's finding that judicial estoppel was "an appropriate remedy," stemmed from its patent frustration with the plaintiff's conduct, including making false statements to the EEOC by denying that she had bipolar disorder, when she had been diagnosed with it two months before and keeping relevant information from her attorneys, defendant, and the Court, such that she "placed substantial, unnecessary burdens on th[e] court," *id.* at *2, 7.

[16] Defendant appears to imply in footnote 2 that the EEOC has inappropriately withheld documents. Judge Wilkinson already denied Defendant's motion to compel and held that the EEOC's approach was consistent with the Federal Rules. (R. Doc. 25.) Further, any insinuations that Ms. Harrison was withholding information from the EEOC are without merit. Ms. Harrison notified the EEOC that she was receiving disability benefits. (Pl.'s Ex. F, Investigator's Notes) ("CP is receiving disability – CP started receiving S.S. disability 4/08".) Further, the EEOC, its investigator, and the Supreme Court all recognize that the requirements for SSDI are different from those for an ADA claim. The investigator testified that she would not ask a charging party about social security: "First, she would have to tell me she applied for Social Security Disability. I wouldn't ask her that question because that is not relevant to you, know, our investigation under the ADA at that point." (Pl.'s Ex I, Alexis Dep. 82:13-17). The investigator also noted: "I don't work for Social Security, so I don't know specifically what it is that they look at, you know, to determine whether or not a person is disabled." (Alexis Dep. 85:2-6.) This is consistent with the

13

representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.'" *Id.* at 802.  The Court noted that there are "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side," *id.* at 802-03, and concluded, "Hence, an individual might qualify for SSDI under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'perform[ing] the essential functions' of her job." *Id.* at 804.  The Court recognized, for example, that "the nature of an individual's disability may change over time." *Id.* at 805.  The Court held, however, that in those cases where "an earlier SSDI claim may turn out genuinely to conflict with an ADA claim," the ADA plaintiff "must proffer a sufficient explanation." *Id.* at 805-06.  The Court explained that one way to explain any inconsistency would be if the plaintiff could perform her job with an accommodation, because the SSA does not consider the possibility of reasonable accommodation. *Id.* at 803.

> To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807.  This analysis entails a fact issue, which, when there is a genuine dispute, should go to the jury. *See Voeltz v. Arctic Cat, Inc.*, 406 F.3d 1047, 1050-51 (8th Cir. 2005) ("any discrepancy in the evidence was for the jury to resolve" where plaintiff stated in SSDI application he was unable to work, but testified he could work with and without accommodation).

       1.  <u>Ms. Harrison's statements to Social Security after being fired are not inconsistent with her statements that she could do her job.</u>

Ms. Harrison's statements to the SSA *after* Defendant fired her are not inconsistent with her statements to the EEOC that she could do her job before Defendant fired her.   These

---

Supreme Court's noting there are "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Cleveland*, 526 U.S. at 802-03.

statements were made about different time periods and reflect her depression at being fired.  *See Cleveland*, 526 U.S. at 807 (plaintiff claimed her "SSDI statements were 'accurate statements' if examined 'in the time period in which they were made.'").  Additionally, there is no evidence that any of Ms. Harrison's statements reflect her inability to perform the essential functions of her position, with or without an accommodation.

Following the Court's ruling in *Cleveland*, the Fifth Circuit has recognized that timing and context are important in evaluating estoppel claims.  The court held in *Labit v. Akzo-Nobel Salt, Inc.*, 209 F.3d 719, 2000 WL 284015 (5th Cir. 2000), that an ADA plaintiff was not estopped from pursuing his claim despite receiving long-term disability and SSDI benefits.  The court noted that although the physical impairment existed prior to the plaintiff's employment with defendant, he had nonetheless remained employed for over twenty years.  The court found it significant that the plaintiff first received SSDI benefits *after* he stopped working for the defendant.  *Id.* at *1.  The court further noted that plaintiff's depression became worse after he left employment, which "could explain the apparent inconsistency." *Id.* at n.11.  Several years later, the Fifth Circuit held that a plaintiff was estopped from pursuing an age discrimination claim, again finding timing to be important. *McClaren v. Morrison Management Specialists, Inc.*, 420 F.3d 457 (5th Cir. 2005).  The court found it significant that, unlike the plaintiff in *Labit*, the plaintiff in *McClaren* stated that he became unable to work *before* the date he was officially terminated. "McClaren swore his disability onset date preceded both his termination and Morrison's official adverse employment action." 420 F.3d at 466.  The plaintiff had also left work on sick leave, before his termination, and did not anticipate returning. *Id.* at 460.  Defendant's reliance on *McClaren* is misplaced — that plaintiff's claims of qualification and disability were inconsistent because they were made about the exact same time period.

15

Unlike the plaintiff in *McClaren*, when Ms. Harrison applied for disability benefits she listed her onset date as September 6, 2007, the day she was terminated, not a date when she was still employed.  Thus, her statements to the EEOC about her ability to do her job are not contradicted by statements that she was unable to work after she was fired.  "The determination of whether an individual with a disability is qualified is to be made *at the time of the employment decision*." 29 CFR Pt. 1630, App., Section 1630.2(m) (emphasis added).

Additionally, the evidence strongly supports the inference that Ms. Harrison's condition worsened as a result of her termination.  *Cleveland*, 526 U.S. at 805 (recognizing that "the nature of an individual's disability may change over time.").  When she applied for disability benefits, Ms. Harrison had been terminated by her employer of almost eight years.  The same year Ms. Harrison had lost her husband.  One family member testified that "[a]fter she was fired, she was crushed . . . it killed her spirit," and further described Ms. Harrison as "completely devastated." (Ex C, Juneau Dep. 54:9-10; 45:5-7.)   Ms. Harrison's sister explained the termination was devastating because Ms. Harrison "loved her job.  She loved the children." (Ex D, Duong Dep. 76:24–77:3.)  Her sister further described Ms. Harrison's job as "a hundred percent [of] her life." (Duong Dep. 50:10-15.)  Her depression increased following her termination. (Duong Dep. 98:23 – 99:2) ("Q. When do you remember depression becoming an issue for Lisa?  A. I think it began when her husband died.  It was much more so when she was terminated from her job.")  Ms. Harrison's personal physician, in an appointment about one week after her termination, ordered a psychiatric consult for severe depression, was concerned with whether Ms. Harrison was suicidal, and placed her on an additional anti-depressant medication. (Ex. A at 1) ("lisa has been working at the family house for 8 yrs acc to pt she was fired due to her weight, feels worthless

and feels like life is not wor[th] living any more, not currently suicidal, very emotional husband died not too long ago".)

Thus, in her disability application, Ms. Harrison listed depression among the conditions that rendered her disabled within the meaning of the Social Security Act.  Her application further reflects her depressed state.  She wrote, "I have been extremely depressed and life feels like it's not worth the effort anymore." (R. Doc. 34-6 at 13.)  These statements show that Ms. Harrison was in a different state after the discharge than when she was working.  A reasonable jury could further infer that statements in the application reflect Ms. Harrison's depression and side-effects of her depression medication.  For example, Ms. Harrison stated "Many of my meds keep my sleepy so some time during the day I nap." (R. Doc. 34-6 at 6.)  She also listed "extreme tiredness" as a side-effect of Cymbalta, the new anti-depressant her doctor had prescribed. (Pl.'s Ex E, SSA 0016.)  Some of the other side effects associated with Cymbalta are body aches or pain, sleepiness or unusual drowsiness, muscle aches, and difficulty with breathing, additional symptoms Ms. Harrison described in her application.[17]

The symptoms of depression itself are also consistent with statements Ms. Harrison made.  Patients with major depression report feeling sad, hopeless and discouraged.  Loss of interest or pleasure, even in activities that were formerly pleasurable, is "nearly always present." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV)*, 349 (Michael B. First, M.D., et al. eds., 4th ed. 2000).  "[S]lowed speech, thinking, and body movements" are common symptoms of depression along with a decrease in energy levels and feeling tired and fatigued—"even small tasks may seem to require a lot of effort."[18]

---

[17] Mayo Clinic, "Duloxetine (Brand name Cymbalta) – Side Effects, More common", available at: http://www.mayoclinic.com/health/drug-information/DR601577/DSECTION=side-effects

[18]— Mayo Clinic, "Depression (major depression)" List of Symptoms, available at: http://www.mayoclinic.com/health/depression/DS00175/DSECTION=symptoms

Major depression may also cause insomnia, trouble thinking and concentrating, and physical aches and pains. DSM-IV at 349.  Consistent with these symptoms, in addition to describing her own sense that she was extremely depressed, Ms. Harrison described her pain, including "hurting all the time," described how she would "get disgusted because I take so long to do a simple job," as well as her descriptions of difficulty concentrating. (R. Doc. 34-6 at 8, 11-12.)  As the Fifth Circuit reasoned in *Labit*, a plaintiff's depression becoming worse after he left employment, "could explain the apparent inconsistency," between being qualified and disabled. 2000 WL 284015 at n.11.  A jury could easily infer from this evidence that Ms. Harrison's statements were not contradictory, but simply reflected the acute worsening of her depression after she was fired.

Finally, in addition to the timing of Ms. Harrison's statements, and her depression, her statements to the SSA were not inconsistent with her ADA charge because she did not assert that she was unable to perform any of the essential functions of her position.  The Fifth Circuit has estopped ADA claims only where plaintiffs' statements are evidence that they were unable to perform the essential functions of their position.  Thus, *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477 (5th Cir. 2000), and *Austin v. Bell South*, 2008 WL 215565 (E.D. La. 2008), are inapposite; both involve plaintiffs who admitted that they were unable to perform essential functions of their job.  *Compare Reed*, 218 F.3d at 479 (noting that the plaintiff "declared that she could not perform 'all of the physical demands necessary to fly a helicopter.'") with *Giles*, 245 F.3d at 486 (noting that defendant's job description "nowhere indicates that climbing, bending, or lifting is essential.").  In *Austin*, the plaintiff applied multiple times and appealed the denial of various disability benefits *while she was still employed*.  The plaintiff further repeatedly admitted, during her employment, that she was unable to do her job, noting specific essential functions that she could not perform. *Id.* at *2-3, 6 ("The record overwhelmingly confirms that

Ms. Austin was not qualified to perform the essential functions of her . . . position . . . . this is corroborated by her own deposition testimony, in which she stated that she was unable to perform the essential functions of her job (such as typing and data entry) from the date of her accident.").

In *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 608 (3d Cir. 2006), the Third Circuit also recognized the importance of reviewing the specific factual statements at issue in holding that an employee's statements in applying for disability benefits did not estop her ADA action. The court recognized, for example, the limitations of vague responses in disability applications:

> . . . that Turner's pain impedes her ability to perform certain occupational functions is hardly a statement of total disability. . . . Neither does Turner's response address the severity of the pain experienced and whether such pain would make her incapable of performing the essential functions of the . . . position. Therefore, because this statement neither is a categorical statement of total inability to perform her job function nor takes into account Turner's entitlement to reasonable accommodation, we do not find that it judicially estops Turner . . .

440 F.3d at 608.  The court also rejected the defendant's contentions, almost identical to those made here, that certain statements "should be read as conclusive as to her inability to perform [her] position." *Id.* at 609.  For example:

> First, we look at Turner's statement that chronic pain, weakness in her arms and shoulders, and her inability to walk far, sit for prolonged periods, bend, stretch, lift more than ten pounds, stoop or kneel are conditions which "impede" her ability to work. While these conditions indisputably impede Turner's ability to work, we cannot say that they foreclose the possibility that she could perform the essential functions of the shaker table inspector position with reasonable accommodation. Certainly, the record does not reflect that the essential functions of her position require walking long distances, stooping, kneeling, or lifting heavy objects. To the extent that the position does require sitting for long periods, bending, and stretching, we see no reason why some reasonable accommodation could not be made.

*Id.*  The Third Circuit clearly rejected the approach Defendant seeks to take – arguing based on no evidence or submission of the essential functions of Ms. Harrison's positions, that her similar

statements to Turner's regarding pain, weakness, inability to walk far, and so forth, automatically estop her ADA claim.  This Court should likewise reject these conclusory averments.  Review of the specific factual statements shows that the statements are not actually inconsistent.

> 2. Ms. Harrison became unable to work by virtue of the attitudes of others towards obesity.

A reasonable jury could also conclude that Ms. Harrison, following her termination, was unable to work because of the attitudes of others.[19]  *See* 29 C.F.R. § 1630.2(l)(2) (prior version). It would be reasonable to conclude that many employers, as Defendant did here, would discriminate against Ms. Harrison in her employment because of her weight.  Discrimination in employment against obese individuals has been recognized in law review articles, scientific studies, and by cities and states that have passed laws prohibiting weight discrimination.  Ms. Harrison knew that she was terminated because of her weight. (*See* R. Doc. 34-7 at 2-3.) Defendant indicated at the time of discharge that her weight caused her to be a danger to others. Further, her description of why she became unable to work mirrors the reason Defendant gave her for firing her: "limited mobility." (*Compare* R. Doc. 34-6 at 3, listing "limited mobility," as the manner in which her condition limits her ability to work, with R. Doc. 34-7 at 3, noting she was terminated because of "limited mobility.")  If all employers held the same attitudes that caused Defendant to fire her, then by virtue of those attitudes, she would be unable to get any job, based on myths and stereotypes concerning obesity.

This case is analogous to *EEOC v. MTS Corp.,* 937 F. Supp. 1503 (D.N.M. 1996),[20] where the Court recognized that the combination of emotional stress and the defendant

---

[19] *See, e.g.,* EEOC Enforcement Guidance on the Effect of Representations Made in Applications for Benefits on the Determination of Whether a Person Is a "Qualified Individual with a Disability" Under the Americans with Disabilities Act of 1990 (ADA), 1997 WL 33159167, *21 (1997) ("In other cases, the plaintiff applies for disability benefits because the employer's alleged discriminatory conduct causes him/her to be unable to work or to believe that s/he cannot work because of discrimination.").

employer's adverse actions can cause an employee to be unable to work.  In that case, the EEOC sued an employer for violating the ADA by retaliating against and terminating an employee with AIDS.  After the charging party had worked for defendant approximately seven years, some employees did not want to work with him because of his AIDS.  The charging party, Brasher, became very upset and took a leave of absence and filed his initial EEOC charge.  *Id.* at 1507-08. During his leave of absence, Brasher was hospitalized for an AIDS-related illness, which may have been aggravated by stress related to his job situation. *Id.* at 1508.  After he requested another leave of absence, defendant terminated him. *Id.*  The defendant asserted in a summary judgment motion that Brasher's application for disability benefits estopped him from asserting he was able to perform the essential functions of the job.  The court denied the motion, reasoning:

> I would not apply the doctrine to the circumstances of this case. Brasher completed the application over the phone, outside of the judicial machinery, without the benefit of counsel, and arguably under a great deal of emotional stress. In addition, under Plaintiffs' version of the facts of this case, Defendants forced Brasher into the unenviable position of being unemployed, in the advanced stages of AIDS, and emotionally devastated by their discriminatory conduct. I decline to exercise my equitable discretion in this area to the benefit of Defendants.

*Id.* at 1511.  The court held that although, like here, the charging party was deceased, that the EEOC had presented "evidence challenging the validity of Defendants' interpretation of the evidence and creat[ing] a factual dispute whether Brasher was able to resume his duties as Senior Manager . . ."  Finally, the court noted that "a factual dispute exists whether the actions of Defendants, rather than Brasher's AIDS, caused Brasher to be unable to work." *Id.*

Like AIDS, obesity carries a stigma that affects individuals in employment.  "Some studies suggest that obesity carries a stigma similar to that of 'AIDS, drug addiction, and criminal behavior.'" Deborah L. Rhodes, *The Injustice of Appearance*, 61 Stan. L. Rev. 1033,

---

[20] Although pre-*Cleveland*, the reasoning is consistent with the Supreme Court's holding in *Cleveland*.

1049 (2009) (citation omitted).  That the attitudes of others affect the employment opportunities of somebody who is morbidly obese is recognized not just by the courts, but by other primary and secondary sources. *See, e.g.,* Elizabeth Theran, *"Free To Be Arbitrary and … Capricious": Weight-Based Discrimination and The Logic of American Antidiscrimination Law*, 11 Cornell J.L. & Pub. Pol'y 113, 156 (2001) ("there is extensive evidence of weight-based discrimination in hiring, wages, promotion, and termination").[21]

The legitimacy of this concern is further illustrated as states and cities have started passing laws prohibiting discrimination on the basis of weight.[22]  Ms. Harrison had worked for at least 18 years in child care, and her employer, a nationwide employer, told her she could no longer work with children because of her weight.  A jury could infer that many employers would not comply with their ADA obligations and that Ms. Harrison reasonably concluded that she was unable to work because of the attitudes of others towards obesity.

3.   Ms. Harrison's statements to Social Security did not take into account reasonable accommodation.

Since *Cleveland*, courts in this Circuit frequently look to the availability of reasonable accommodations in holding that estoppel is not appropriate based on an ADA claimant's successful receipt of SSDI benefits. *See, e.g., Giles*, 245 F.3d 474 (holding that plaintiff was not judicially estopped from pursuing disability claim because he explained that he could perform

---

[21] "Fat people are often denied jobs because of their weight. One study showed that almost 16% of employers would not hire "obese women" at all. Furthermore, about 44% of employers said that they would use the fact that a female job candidate was "obese" as "conditional medical grounds for passing over an applicant." . . . In one study, subjects were asked to give their impressions of three potential workers about whom they were told nothing other than sex and weight. The study participants viewed the overweight candidates as "less competent, less productive, not industrious, disorganized, indecisive, inactive, and less successful." Similarly, when subjects were shown videotapes of two people, one fat and one thin, taking employee-selection tests and performing almost identically, they rated the fat applicant as a less desirable employee than the thin applicant."  Kristen, *Addressing the Problem of Weight Discrimination in Employment*, 90 Ca. L. Rev. 57, 62-63 (2002) (citations omitted).

[22] Laws have passed in Michigan, D.C., San Francisco, and Santa Cruz. *See* Mich. Comp. Laws Ann. § 37.2202(1)(a) (weight); D.C. Code Ann. § 2-1401.01 (2001) (appearance); S.F. Cal. Compliance Guidelines to Prohibit Weight & Height Discrimination (2001); Santa Cruz, Cal., Mun. Code § 9.83.010 (1995) (weight).

his job with reasonable accommodation). In *EEOC v. SFAILA, LLC*, 666 F. Supp. 2d 637 (E.D. La. 2009), Judge Feldman held that the charging party's application for and receipt of disability benefits did not preclude her ADA claim. The court concisely rejected Defendant's estoppel argument, reasoning that the charging party's testimony indicated she was capable of working, with accommodation, despite the severe symptoms of her ulcerative colitis. *Id.* at 639, 651.[23] In *Bonano v. Reagan Equipment Co., Inc.*, 99-1028, 1999 WL 1072547 (E.D. La. Nov. 23, 1999), the plaintiff applied for SSDI benefits a week after his termination. The plaintiff contended he could have performed his position with reasonable accommodations. He also noted his reliance on his employer's actions in determining that he was now unable to work:

> He contends that if the employer for whom he worked for 18 years, and for whom he was working at the time he was injured, would not accommodate his disability, including excusing reasonable absences and tardiness for medical appointments, he did not expect that any employer in the workplace would grant him these accommodations.

*Id.* at *3. The court denied summary judgment, holding, "plaintiff [] provided a reasonable explanation for the statements he made."

Defendant has asserted the affirmative defense of direct threat. The Statute defines "direct threat," as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3) (prior version). It is Defendant's ultimate burden at trial to prove direct threat, including proving that any threat could not be eliminated by reasonable accommodation. *EEOC v. E.I. Du Pont de Nemours & Co.*, 406 F. Supp. 2d 645, 652 (E.D. La. 2005), *aff'd in part, rev'd in part on other grounds*, 480 F.3d 724 (5th Cir. 2007); *Dadian v. Village of Wilmette*, 269 F.3d 831, 841 (7th Cir. 2001) ("[I]t is the employer's burden to show than an employee posed a direct threat to workplace safety that could not be eliminated

---

[23] There is no evidence that the charging party ever requested an accommodation. 666 F. Supp. 2d at 647.

by reasonable accommodation.").  Defendant had a legal obligation, before terminating Ms. Harrison on the basis of direct threat, to determine whether any alleged threat could be eliminated by reasonable accommodation.[24]

The ADA's definition of "reasonable accommodation" includes "job restructuring, part-time or modified work schedules," and "acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9).  The federal regulations implementing the ADA state:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).  In cases, such as this one, where the employer terminated the employee with no notice to the employee that her job was at risk, or that the employer perceived her to be a direct threat, it would be impossible for the employee to initiate the required interactive process.  Instead, the burden falls to the employer, here, the Defendant:

> In many cases, an employee must request an accommodation before the employer's duty is triggered.  In this case, however, it would not be reasonable to require plaintiff to request an accommodation when he did not think he needed one and defendant never informed him until his termination that his disability was interfering with his job.

*Hammel v. Eau Galle Cheese Factory*, 02-405, 2003 WL 21067091, *9 (W.D. Wis. Apr. 15, 2003) (internal citation omitted); *see also Cutrera v. Board of Sup'rs of Louisiana State University*, 429 F.3d 108, 113 (5th Cir. 2005) ("An employer may not stymie the interactive

---

[24] S*ee, e.g., Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 (5th Cir. 2007) ("When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA."); *Liner v. Hospital Service Dist. No. 1 of Jefferson Parish*, 230 Fed. App'x 361, 2007 WL 1111565, *3-4 (5th Cir. 2007) (upholding jury's verdict that employer failed to make good faith effort to reasonably accommodate employee's disability where it terminated him rather than engage in the interactive process).

process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended.").

Here, there were several simple, affordable reasonable accommodations Defendant could have made, if it had concerns that Ms. Harrison posed a direct threat, which would have reduced or eliminated that alleged threat. As discussed in the attached expert report of Joan Stein, an expert on aspects of the ADA relating to accessibility, accommodation, and direct threat, the simple steps of installing a baby gate at the bottom of the steps in the apartment Ms. Harrison worked in would have prevented any children from running upstairs. (Pl.'s Ex H at p. 9-19.) Installing a gate at the entrance to the Family House facility would have prevented children from running onto Holmes Boulevard, and allowing Ms. Harrison to use her own motorized scooter or other assistive device in the outside areas of the facility would have decreased or eliminated any concerns Defendant had that Ms. Harrison had "limited mobility." (*Id.*) Thus, for this additional reason, there is no inconsistency between Ms. Harrison's statements of qualification to the EEOC and disability to the SSA. *See, e.g., SFAILA, LLC*, 666 F. Supp. 2d at 651 ("Saks has not shown that Ms. Babin's social security disabled status is inconsistent with her being capable of working, with accommodation").

## V.   CONCLUSION

For these reasons, and based on the evidence submitted with this Opposition, Defendant has not met its Rule 56 burden of establishing the absence of any genuine disputes of material fact. The EEOC therefore respectfully requests that the Court deny Defendant's motion.

Respectfully submitted,


**P. DAVID LOPEZ**
General Counsel
No Bar Roll Number Assigned
**JAMES L. LEE**
Deputy General Counsel
No Bar Roll Number Assigned
**GWENDOLYN YOUNG REAMS**
Associate General Counsel
No Bar Roll Number Assigned
**JIM SACHER**
Regional Attorney
La. Bar Roll Number 14888
Equal Employment Opportunity
Commission
Houston District Office
Mickey Leland Federal Building
1919 Smith Street
Houston, Texas 77002-8049
Direct Line: (713) 209-3398


/s/ Tanya L. Goldman
**GREGORY T. JUGE**
Acting Supervisory Trial Attorney
La. Bar Roll No. 20890
**TANYA L. GOLDMAN**
Trial Attorney
No Bar Roll Number Assigned
**U.S. EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**
New Orleans Field Office
1555 Poydras Street
Suite 1900
New Orleans, LA  70112
Tel:      (504) 595-2878 (Main Legal #)
             (504) 595-2877 (Juge)
             (504) 595-2914 (Goldman)
Fax:      (504) 595-2886 or 589-6861
E-mail: Gregory.Juge@eeoc.gov
             Tanya.Goldman@eeoc.gov
**COUNSEL FOR PLAINTIFF,**
**U.S. EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**

### CERTIFICATE OF SERVICE

       I hereby certify that a copy of the foregoing has been served on counsel of record for all parties, via email, United States mail, postage pre-paid, via facsimile transmission, via hand delivery, via E.C.F., or via next day delivery.


November 15, 2011_____                        /s/ Tanya L. Goldman_____
Date                                         Tanya L. Goldman